IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

                    Plaintiff,

                    v.

KRISTINE L. JOHNSON,
TROY A. BARNES, and
WORK WITH TROY BARNES, INC. (d/b/a THE ACHIEVE COMMUNITY),

                    Defendants,

and

ACHIEVE INTERNATIONAL, LLC,

                    Relief Defendant.

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
EMERGENCY MOTION FOR AN ORDER GRANTING
AN *EX PARTE* ASSET FREEZE, TEMPORARY RESTRAINING ORDER,
AND OTHER EMERGENCY RELIEF**

---

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   STATEMENT OF FACTS ........................................................................................3

      A.  Defendants and Relief Defendant ...............................................................3

      B.  Defendants' Fraudulent Securities Offering ...............................................4

      C.  TAC is a Ponzi and Pyramid Scheme .........................................................8

      D.  Defendants Have Misappropriated Investor Funds......................................9

      E.  Defendants Made False, Fraudulent, and Material Misrepresentations
          and Omissions in Connection with the TAC Scheme.................................10

          1.  Material Misrepresentations and Omissions Regarding Use of Investor
              Proceeds and Ponzi Payments..............................................................10

          2.  Material Omissions Regarding Misappropriation of Investor Funds ...................12

III.  LEGAL ARGUMENT...............................................................................................12

      A.  Defendants are Violating the Anti-Fraud Provisions of the Securities Laws ..............13

          1.  The TAC "Positions" Are Securities ....................................................13

          2.  Scheme Liability – Exchange Act Rule 10b-5(a) and (c) and Securities
              Act Section 17(a)(1) and (3) .................................................................15

          3.  Misleading Statements and Omissions – Exchange Act Section 10(b) and
              Rule 10b-5(b)........................................................................................18

          4.  Misleading Statements and Omissions – Securities Act Section 17(a)(2)............21

      B.  An Immediate Asset Freeze is Necessary to Prevent Further Dissipation of
          Investor Funds.............................................................................................22

      C.  A Temporary Restraining Order is Appropriate to Prevent Ongoing Violations ........25

      D.  A Prohibition Against Soliciting Additional Investment Funds is Necessary to
          Prevent Investors from Being Further Harmed..........................................27

E.  An Accounting is Necessary to Identify the Location of Investor Funds....................27

F.  Expedited Discovery, Alternative Means of Service, and a Prohibition against the Destruction or Alteration of Documents is Necessary to Prepare for Review of Plaintiff's Motion for a Preliminary Injunction ........................................28

G.  Entry Of An Order *Ex Parte* Is Appropriate...............................................................28

IV.  CONCLUSION..............................................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) ................................................. 20

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) ..................................................... 13

*Basic v. Levinson*, 485 U.S. 224 (1988) ........................................................................................ 22

*Berrios-Bones v. Nexidis, LLC,* 07-cv-193, 2007 WL 3231549 (D. Utah Oct. 20, 2007)............ 14

*Burnett v. Rowzee*, 561 F. Supp. 2d 1120 (C.D. Cal. 2008) ......................................................... 18

*Centra, Inc. v. Chandler Ins. Co., Ltd.*, 2000 WL 1277672 (10th Cir. 2000) .............................. 20

*City of Phila. v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001)................................................... 19

*Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008) ........................................................................... 19

*Eberhard v. Marcu*, 530 F.3d 122
    (2d Cir.2008)............................................................................................................................. 7

*Fidelity Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172 (10th Cir. 1989) .......................... 18

*In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004) ...... 16

*In re Bayou Group, LLC*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007) ................................................. 18

*In re Bullion Reserve of North America*, 836 F.2d 1214 (9th Cir. 1988) ..................................... 17

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004)............................ 16

*In re Level 3 Communications, Inc. Sec. Lit.*, 667 F.3d 1331 (10th Cir. 2012)............................ 19

*In re Merck & Co., Inc. Securities, Derivative, & ERISA Litig.*, No.05-1151,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) .............................................................................. 21

*In re Qwest Communications International, Inc. Securities Litigation*, 241 F.Supp.2d 1119
    (D.Colo.2002) ......................................................................................................................... 30

*In the Matter of Flannery and Hopkins*, SEC Rel. No. 34-73840, 2014 WL 7145625
    (Dec. 15, 2014) ....................................................................................................................... 18

*Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011).......................... 21

*Kunz v. SEC*, 64 Fed. App'x 659 (10th Cir. 2003) ........................................................ 23

*Lundgrin v. Claytor*, 619 F.2d 61 (10th Cir. 1980)......................................................... 30

*McGill v. American Land & Exploration Company*, 776 F.2d 923 (10th Cir. 1985).................. 15

*Reeves v. Ernst & Young*, 494 U.S. 56 (1990)............................................................ 14

*SEC v. Aragon Capital Advisors, LLC*, No. 07 Civ. 919(FM), 2011 WL 3278642
   (S.D.N.Y. July 26, 2011) .......................................................................... 27

*SEC v. Benger*, 931 F. Supp. 2d 904 (N.D. Ill. 2013)..................................................... 25

*SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167 (D.D.C. 1998)........................................ 23

*SEC v. Bravata*, 763 F. Supp. 2d 891 (E.D. Mich. 2011) ................................................. 23

*SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90 (2d Cir. 1978........................................... 31

*SEC v. Credit Bancorp Ltd.*, 2010 WL 768944 (S.D.N.Y. Mar. 8, 2010) ................................... 27

*SEC v. Curshen*, 372 Fed. Appx. 872 (10th Cir. 2010) ................................................... 22

*SEC v. Edwards*, 540 U.S. 389 (2004)...................................................................... 14

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ........................................... 16

*SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.)........................................... 15

*SEC v. Heden*, 51 F. Supp. 2d 296 (S.D.N.Y. 1999) ...................................................... 27

*SEC v. International Loan Network, Inc.*, 770 F. Supp. 678 (D.D.C. 1991) ............................... 15

*SEC v. International Swiss Investment Corp.*, 895 F.2d 1272 (9th Cir. 1990) ........................... 32

*SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974) ..................................... 15

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010)........................................................ 16

*SEC v. Lucent Tech., Inc.*, 610 F.Supp.2d 342 (D.N.J.2009) ............................................ 17

*SEC v. Management Solutions, Inc.*, No. 11-cv-1165, 2013 WL 4501088
   (D. Utah Aug. 22, 2013) ...................................................................... 17, 19

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ..................................... 26

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)........................................ 27, 31

*SEC v. McDuffie*, No. 12-cv-02939, 2014 WL 4548723 (D. Colo. Sept. 15, 2014)... 13, 16, 17, 21

*SEC v. Mgmt. Dynamics, Inc.*, 515 F. 2d 801 (2d Cir. 1975) ......................................... 30

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ............................................................. 23

*SEC v. Parrish*, 2012 WL 4378114 (D. Colo. Sept. 25, 2012 ....................................... 19

*SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377 (S.D.N.Y. 2012) ............................. 25

*SEC v. Presto Telecommunications, Inc.*, 153 Fed. App'x 428 (9th Cir. Nov. 2, 2005) .............. 26

*SEC v. Sentinel Management Group, Inc.*, No. 07 C 4684, 2012 WL 1079961
   (N.D. Ill. Mar. 30, 2012) ..................................................................................... 25

*SEC v. Shields*, No. 11-cv-02121, 2011 WL 3799061 (D. Colo. Aug. 26, 2011) ................. 12, 30

*SEC v. Smart*, 678 F.3d 850
   (10th Cir. 2012) ................................................................................ 13, 21, 24, 25

*SEC v. Smart*, No. 09-cv-224, 2011 WL 2297659 (D. Utah June 11, 2011) ......................... 15, 17

*SEC v. Stoker*, 865 F. Supp. 2d 457 (S.D.N.Y. 2012) ................................................... 25

*SEC v. Sullivan*, --- F. Supp. 3d ---, 2014 WL 4670929 (D. Colo. Sept. 19, 2014) ................... 18

*SEC v. The Infinity Group Co.*, 212 F.3d 180 (3d Cir. 2000) .......................................... 27

*SEC v. TLC Inv. and Trade Co.*, 179 F. Supp. 2d 1149 (C.D. Cal. 2001) ................................... 23

*SEC v. U.S. Envtl., Inc.*, 155 F.3d 107 (2d Cir. 1998) ................................................. 16

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) .......................................... 27, 29, 30

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ....................................................... 14, 15

*SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980) ....................................................... 26

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ............................................... *passim*

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) .......................................................... 12, 27

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ......................... 16

*Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ................. 21

*TSC Indus. v. Northway*, 426 U.S. 438 (1976) ....................................................... 23

*U.S. v. Nacchio*, 519 F.3d 1149 (10th Cir. 2008) ......................................................................... 23

*United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975) ............................................... 14

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008) ................................................................. 16

*United States v. First National City Bank*, 379 U.S. 378 (1965) ................................................... 26

*Webster v. Omnitron Int'l*, 79 F.3d 776 (9th Cir.1996) ................................................................. 19

Plaintiff United States Securities and Exchange Commission ("Commission" or "SEC") submits this memorandum in support of its Emergency Motion for an Order Granting an *Ex Parte* Asset Freeze, Temporary Restraining Order, and Other Emergency Relief.

## I.      PRELIMINARY STATEMENT

Defendants are currently operating an active Ponzi scheme. Defendants Kristine L. Johnson and Troy A. Barnes are the founders of a fraudulent investment scheme called "The Achieve Community" ("TAC"). Defendant Work With Troy Barnes, Inc. is the corporate entity behind TAC. Since approximately April 2014, Defendants have raised more than $3.8 million from investors, primarily through videos and promotional materials posted on Internet websites. Through their marketing efforts, Defendants entice investors to buy "positions" in TAC, which are securities under federal law. Defendants promise investors extraordinary returns of 700 percent – for each $50 "position" purchased, investors are promised a $400 payout. Defendants claim that TAC generates these extraordinary investment returns through a "triple algorithm" that Johnson and Barnes developed. Defendants further claim that TAC is a long-term, stable program that will generate "limitless," "lifetime" returns. Defendants portray these investments as legitimate, going so far as to expressly disclaim that TAC is a pyramid scheme.

In reality, TAC is a pure Ponzi and pyramid scheme. Early investors are paid their purported investment returns from the funds of newer investors. Indeed, TAC has no legitimate business operations; the only funds available to pay the promised investment returns come from new investors lured into the scheme.

In addition to operating a Ponzi and pyramid scheme, Defendants have also misappropriated approximately $200,000 in investor funds for their own personal use, including

to buy a new car and to pay personal credit card bills. Further, Defendants have siphoned investor funds to an account held by Relief Defendant Achieve International, LLC and have then misappropriated funds out of that account.

In addition, Defendants' misappropriation is growing more brazen. In just the last month, Johnson has misappropriated more than $100,000 from an account controlled by Relief Defendant Achieve International. Moreover, Johnson recently closed TAC's bank accounts and transferred those funds to another bank, with seemingly no legitimate business reason for the move.

The need for emergency relief is urgent. Of the $3.8 million in investor funds collected, approximately $1.4 million has already been paid out in Ponzi payments to investors. Indeed, Defendants have attempted to make additional Ponzi payments as recently as the last few weeks. Defendants were recently dropped by the payment processor who handled distribution of TAC's investor funds over concerns that TAC was a Ponzi and pyramid scheme. Defendants have located a new payment processor and transferred more than $800,000 in investor funds to that processor, to be distributed as Ponzi scheme payments. The Commission understands the processor has not yet completed any of the payments. If these Ponzi scheme payments are made, numerous investors will be irreparably injured, as their investments will be used to pay off earlier investors in the scheme. The nature of the Ponzi payments amplifies the harm: Defendants must take the $50 investment from eight new investors in order to pay an earlier investor the $400 he or she "earned" on a $50 position in TAC.

In light of the egregiousness of Defendants' conduct, the ongoing and active Ponzi scheme, Defendants' increasingly desperate attempts to make Ponzi payments and

misappropriate investor funds, and the concern that Defendants will dissipate or misappropriate the remaining investor funds if they become aware of this action prior to the entry of the requested order, the Commission respectfully requests that the Court grant *ex parte* relief freezing the assets of Defendants and Relief Defendant, prohibiting them from soliciting additional investors or otherwise continuing their fraudulent scheme, and ordering other relief to ensure a prompt, fulsome, and fair hearing on Plaintiff's motion for a preliminary injunction. Absent an order granting such emergency *ex parte* relief, there is no reason to think Defendants' fraudulent scheme, and their misappropriation and dissipation of the remaining investor funds, will cease, or that there will be any funds available to compensate investor victims at the conclusion of this litigation.

## II.   STATEMENT OF FACTS

**A.   Defendants and Relief Defendant**

Kristine Johnson, age 60, is a resident of Aurora, Colorado. (Felder Decl. ¶ 15.a.)[1] She, along with Barnes, is one of the two founders of TAC. (Felder Decl. ¶ 15.) She is featured on numerous videos posted on TAC's website soliciting investors and touting the TAC scheme. (Felder Decl. ¶ 15.a, 16, & 53.)

Troy Barnes, age 52, is a resident of Riverview, Michigan. (Felder Decl. ¶ 15.b.) He is the other founder of TAC, along with Johnson. (Felder Decl. ¶ 15.) Like Johnson, he is actively

---

[1] Citations to "Felder Decl." refer to the Declaration of Jeffrey D. Felder. Citations to "Engelhart Decl." refer to the Declaration of Helena M. Engelhart. Citations to "Matticks Decl." refer to the Declaration of Kerry M. Matticks. Citations to "Taveras Decl." refer to the Declaration of Carmen Taveras, Ph.D. All declarations, and their accompanying exhibits, have been filed concurrently with the Commission's motion for emergency *ex parte* relief.

engaged in touting the TAC scheme, including through videos that he posts on the Internet website YouTube. (Felder Decl. ¶ 15.b, 16, & 53.)

Work With Troy Barnes, Inc. is a Delaware corporation with its principal places of business in Aurora, Colorado and Riverview, Michigan. (Felder Decl. ¶ 12.) WWTB was incorporated in March 2014. (Felder Decl. ¶ 12.) TAC does not exist as a separate, legal entity. (Felder Decl. ¶ 13.) Rather, TAC is, essentially, a trade name for WWTB; WWTB does business as TAC. (Felder Decl. ¶ 13.) For example, TAC's website states that WWTB owns the website's copyright. (Felder Decl. ¶ 11.) Further, WWTB's bank accounts are used to handle TAC investor funds. (Felder Decl. ¶ 28-38.)

Achieve International, LLC is a Colorado limited liability company with its principal place of business in Aurora, Colorado. (Felder Decl. ¶ 31.) Johnson formed Achieve International in October 2014. (Felder Decl. ¶ 31.) At least one bank account held in the name of Achieve International is used to handle TAC investor funds. (*See* Felder Decl. ¶ 33.d.)

## B.    Defendants' Fraudulent Securities Offering

From approximately April 2014 through the present, WWTB, doing business as TAC, has been soliciting funds from investors by offering and selling so-called "positions" in TAC. (Felder Decl. ¶ 17 & 33.a.) "Positions" are sold for $50 each, and investors are promised that each $50 "position" will pay out $400 – a return of 700%. (Felder Decl. ¶ 17.) Investors are told that, while the time to generate investment returns is not guaranteed, they can generally expect their returns in three to six months. (Felder Decl. ¶ 21.) A 700% return over six months equates to a ***6300% return*** on an annualized basis. (Taveras Decl. ¶ 10.)

4

Investors are not required to do anything other than purchase "positions" to earn these promised returns: they are not required to sell any product or recruit additional investors. (Felder Decl. ¶ 17.) Investors are, however, encouraged to purchase more "positions" so that they can purportedly earn more money. (Felder Decl. ¶ 17.)

Johnson and Barnes are primarily responsible for TAC's offering. (Felder Decl. ¶ 16.) They are the self-proclaimed co-founders of TAC. (Felder Decl. ¶ 14.) Further, in various videos and promotional materials on TAC's website and other online channels, Johnson and Barnes solicit investors to purchase "positions" in TAC, tout the benefits of an investment in TAC, and otherwise encourage investors to get – and stay – involved in the scheme. (Felder Decl. ¶ 53-58; *see generally* Engelhart Decl., Exs. A-K)

WWTB, Johnson, and Barnes promote a TAC investment as a safe, long-term investment strategy. For example, TAC's website, www.readytoachieve.com, lures investors by claiming that "you and anyone you know can Make as Much Money as you want. You start with a $50 position, each $50 position pays you $400 and you can Purchase as many positions as you want." (Felder Decl. ¶ 56.c.) Similarly, in a short video on the TAC website, which Johnson narrates, investors are told that TAC is a "lifetime income plan." (Felder Decl. ¶ 56.b.) Such lifetime income is possible, the video continues, because

> Every $50 position you purchase, you make $400. With two positions, you make $800. With five positions, you make $2,000. Want to go bigger? With twenty positions, you make $8,000. With one hundred positions, you make $40,000. This is limitless.

(Felder Decl. ¶ 56.b.) Barnes makes similar claims, contending that TAC "will teach you how to take $50 and turn it into thousands of dollars, and that's a fact," and that investors "can make as much money as you want." (Engelhart Decl., Ex. E.) He further claims that TAC has "amazing"

stability and that the program will continue long into the future. (Engelhart Decl., Ex. H.) And he claims that the number of members being paid is going to double in two months, "I guarantee it." (Engelhart Decl., Ex. K.)

Investors are encouraged to keep their money invested with TAC. (Felder Decl. ¶ 17.) Defendants' tout a so-called "Re-Purchase" strategy, by which investors can supposedly multiply their eventual earnings by buying additional positions with their investment returns. (Felder Decl. ¶ 17.) For example, in a short video on TAC's website, again narrated by Johnson, investors are told that by purchasing one $50 "position," and then using the $400 investment return to repurchase eight new positions, the investor would earn $3,200; by repurchasing again, the investor would then have 64 positions worth more than $25,000. (Engelhart Decl., Ex. B.) Johnson states that this strategy will "give you the same income over and over again, forever." (Engelhart Decl., Ex. B.) Barnes makes similar statements about TAC's "Re-Purchase" strategy. (Felder Decl. ¶ 58.b.) For example, in a video posted on YouTube touting TAC, Barnes states that investors can repurchase more "positions" to make more money. (Felder Decl. ¶ 58.b; Engelhart Decl., Ex. I.) In the same YouTube video, Barnes claims that, with the "Re-Purchase" strategy, it is "very easy to make six figures." (Felder Decl. ¶ 58.b; Engelhart Decl., Ex. I.)

In addition to selling "positions," TAC nominally offers investors access to certain online marketing materials and online banner advertisements, which investors can access in a members-only section of TAC's website after purchasing at least one "position." (Felder Decl. ¶¶ 22-23.) However, the focus of TAC's promotional material is on the investment opportunity and extraordinary investment returns. (Felder Decl. ¶ 24.) Nor does it appear that TAC has generated any revenue from the use or sale of these marketing materials. (Felder Decl. ¶ 25.) Moreover, as

noted above, investors are not required to access or use these marketing materials in order to earn returns. (Felder Decl. ¶ 17.) In any event, the materials appear to be aimed toward helping people further promote TAC's scheme by advertising the scheme to new potential investors. (Felder Decl. ¶ 24.)[2]

While TAC does not provide much transparency to investors about how it generates returns, it does expressly disclaim it is a Ponzi or pyramid scheme.[3] (Felder Decl. ¶ 56.a.) Specifically, in a video on TAC's website about the opportunities TAC offers, Johnson claims at the outset that "*[w]e are not a pyramid scheme*." (Felder Decl. ¶ 56.a; Engelhart Decl., Ex. B.) Instead, TAC claims that it is able to pay the extraordinary investment returns as a result of a "triple algorithm" and "matrix" that Johnson and Barnes created. (Felder Decl. ¶ 19 & 57.a.) More specifically, in a recorded conference call promoted on TAC's website, Johnson and Barnes are asked by a TAC promoter to explain the algorithm that purportedly drives TAC's

---

[2] In light of Commission policy prohibiting Commission staff from accessing restricted portions of investor websites, as well as the emergency nature of this action and the need to not alert Defendants of the investigation, the Commission staff has not personally viewed or otherwise subpoenaed the materials in the members-only section of TAC's website. (Felder Decl. ¶ 22.) Further, given the Commission's concern that, if investors were alerted to the SEC's investigation, they would quickly disseminate that information to other TAC investors, as well as Defendants, which could risk additional dissipation or misappropriation of investor funds, the Commission staff has not contacted any TAC investors in preparation for filing this emergency action. (Felder Decl. ¶ 61.)

[3] "Ponzi schemes" and "pyramid schemes" are closely related. A Ponzi scheme is "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for original investors, whose example attracts even larger investments." *Black's Law Dictionary* 1348 (10th ed. 2014). Similarly, a pyramid scheme is "[a] dishonest and often illegal way of selling investments, whereby money from later investors is used to pay people in the system who have already invested." *Id.* at 1432. *See also Eberhard v. Marcu*, 530 F.3d 122, 132 n. 7 (2d Cir.2008) (describing typical "Ponzi scheme" as "a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses").

success. (Engelhart Decl., Ex. D.)  Johnson claims that, after considering what did not work with other investment programs, one day she envisioned a "triple algorithm" and "3-D" matrix. (Engelhart Decl., Ex. D.) Johnson claims this was the "little secret ingredient" behind TAC's success. (Engelhart Decl., Ex. D.) Barnes then claims he hired a seasoned programmer who spent three months perfecting the "triple algorithm" investment formula. (Engelhart Decl., Ex. D.) Barnes concludes by claiming that the "triple algorithm" works, that "we're paying out loads of money," and that "as we grow it's going to be in the hundreds of thousands. It's going to be amazing." (Engelhart Decl., Ex. D.)

**C.     TAC is a Ponzi and Pyramid Scheme.**

Despite the statement to the contrary, in fact TAC is a Ponzi and pyramid scheme. (Felder Decl. ¶¶ 26-27, 35.) The only income to TAC's bank accounts is from investor funds. (Felder Decl. ¶ 35.) Neither Johnson nor Barnes appears to have made any effort to generate profits from any legitimate business operations from which they could pay the promised 700% investor returns. (Felder Decl. ¶ 20.) Instead, the sole source of repayments to earlier investors is funds contributed by newer investors. (Felder Decl. ¶ 35.)

Johnson and Barnes are both significantly involved in TAC's operations and finances. They are the founders of TAC's operation. (Felder Decl. ¶ 14-15.) Johnson is the signatory on TAC's various bank accounts, and handles much of the banking activity. (Felder Decl. ¶ 33.) Both were involved in locating a new payment processor when the processor TAC had been using terminated its relationship with TAC over concerns TAC was a Ponzi scheme. (Felder Decl. ¶¶ 43-45.) And Barnes has been in regular communication with the new payment processor

8

in an attempt to get that processor to complete Ponzi payments to TAC investors. (Felder Decl. ¶ 45.) Johnson and Barnes are plainly aware that TAC is a Ponzi and pyramid scheme.

**D.      Defendants Have Misappropriated Investor Funds.**

In addition to operating a Ponzi and pyramid scheme, Defendants have misappropriated investors funds for Johnson and Barnes' own personal use. TAC has several accounts at FirstBank in the name of either WWTB or Achieve International. (Felder Decl. ¶¶ 28-33.) The funds in those accounts are almost entirely from investors. (Felder Decl. ¶¶ 34-35.)[4] On more than a dozen occasions, Johnson has withdrawn cash from these accounts, and later deposited that cash in her personal bank account. (Felder Decl. ¶¶ 36.c & 50; Matticks Decl. Ex. G.) These cash withdrawals have been increasing in size in recent months; Johnson's initial withdrawals in the summer of 2014 were between $1,000 and $5,500 each, but since the beginning of 2015 she has made two withdrawals totaling $110,000. (Felder Decl. ¶ 52; Matticks Decl. Ex. G.) In total, Johnson has made cash withdrawals of investor funds of more than $150,000. (Felder Decl. ¶¶ 36.c & 46; Matticks Decl. Ex. G.)

Similarly, on more than a dozen occasions, Johnson transferred investor funds to Barnes. (Felder Decl. ¶ 36.d.) These transfers total nearly $40,000. (Felder Decl. ¶ 36.d.)[5]

---

[4] The investor funds deposited into the four FirstBank accounts total approximately $3.83 million. (Felder Decl. ¶ 34.b.) There are also miscellaneous deposits, which may or may not be investor funds, that total approximately $25,000. (Felder Decl. ¶ 34.c.)

[5] Johnson and Barnes have also appear to have paid themselves significant returns on their own purported investments in TAC: Barnes has received more than $100,000 in payouts, and Johnson has received more than $40,000. (Felder Decl. ¶¶ 39-40.) Indeed, based on TAC's records, Barnes is the only investor who has received a six-figure pay-out. (Felder Decl. ¶ 58.)

Johnson, at least, has spent the misappropriated funds on various personal expenses. (Felder Decl. ¶ 51.) For example, she purchased a new car for nearly $35,000, and made over $25,000 in credit card purchases. (Felder Decl. ¶ 51.)[6]

**E.   Defendants Made False, Fraudulent, and Material Misrepresentations and Omissions in Connection with the TAC Scheme.**

Throughout their scheme, Defendants made, and continue to make, numerous misrepresentations and omissions regarding TAC's operations, financial conditions, and use of investor funds. (Felder Decl. ¶¶ 53-60.) As detailed below, both Johnson and Barnes personally made numerous misrepresentations and omissions. *See also supra* Sec. II.B. Further, various misrepresentations and omissions made by Johnson and Barnes – WWTB's co-founders and agents – were published on TAC's website, which WWTB controls. (Felder Decl. ¶¶ 11 & 56-57.) *See also supra* Sec. II.B. WWTB is liable for these statements.

**1.   Material Misrepresentations and Omissions Regarding Use of Investor Proceeds and Ponzi Payments**

Defendants made material misrepresentations and omission regarding TAC's use of investor funds, characterizing the enterprise as a legitimate investment opportunity and failing to inform investors that TAC was, in fact, a Ponzi and pyramid scheme. (Felder Decl. ¶ 55-60.) Indeed, Defendants went so far as to expressly disclaim that TAC is "not a pyramid scheme," and instead touted TAC as a long-term, stable investment opportunity. (Felder Decl. ¶ 56;

---

[6] Due to the emergency nature of this filing, the Commission has not obtained Barnes' bank records and therefore has not determined how he has spent the misappropriated investor funds. (Felder Decl. ¶ 62.)

Engelhart Decl., Exs. E, H, K.) Never did Defendants disclose to investors that TAC is, in reality, a Ponzi and pyramid scheme. (Felder Decl. ¶ 60.)[7]

Defendants also claim that TAC is able to pay its extraordinary investment returns as a result of a "triple algorithm" and "matrix." More specifically, Johnson claims that the triple algorithm involved a "3D," or three-dimensional, matrix that, Johnson claims, "I just saw it in my head. This matrix is 3D, which is why we can't put it on paper." (Engelhart Decl., Ex. D.) Barnes further claims he hired a developer who spent three months developing the "triple algorithm." (Engelhart Decl., Ex. D.) These claims, which are designed to lure investors into believing there is a legitimate strategy behind TAC's investment returns, are false and misleading. As detailed in the declaration of Carmen Taveras, Ph.D., an analyst in the Commission's Division of Economic Risk and Analysis, a "triple algorithm" is not a term of art in the investment world. (Taveras Decl. ¶ 6.) Moreover, while multi-dimensional matrices do exist, if they are legitimate they can be described just as any other mathematical concept: they can be written down. (*See* Taveras Decl. ¶ 8.)

---

[7] Defendants occasionally make certain generic statements about additional investors helping to generate additional funds. For example, in a video posted on TAC's website, Johnson states that "you'll make [money] much quicker if you share this with other people. Because our matrix depends on positions, not time to move." (Engelhart Decl., Ex. B.) Similarly, in a video posted online, Barnes explains that an investor is paid their payments after a certain number of additional people join the matrix. (Engelhart Decl., Ex. F.) And in a disclaimer posted on www.readytoachieve.com, TAC states that there is no guarantee an investor will earn money. (Felder Decl. ¶ 60.) However, none of these statements disclose that TAC is operating as a Ponzi scheme or that the only source of funds to pay investor returns is money from new investors. (*See* Felder Decl. ¶ 60.) Moreover, they do not cure the fact that TAC explicitly denies being a pyramid scheme.

**2.      Material Omissions Regarding Misappropriation of Investor Funds**

In addition, Defendants defrauded investors by failing to disclose they were misappropriating investor funds. Defendants often touted the friendly, community nature of TAC. (Engelhart Decl., Ex. A.) For example, in a short video posted on TAC's website, narrated by Johnson, Johnson states that TAC is "a group of people that want to help each other, ourselves, and the people we care about to achieve the lifestyle and financial freedoms that we've always dreamed about." (Engelhart Decl., Ex. A.) Similarly, in a video posted online touting TAC, Barnes claims that he and Johnson founded TAC "to help a whole lot of people." (Engelhart Decl., Ex. E.) In another online video, Barnes claims that "we're just here to help you and to help you make a whole lot of money." Notably absent from these encouraging statements is any disclosure that, in fact, Johnson and Barnes had misappropriated investor funds for their personal benefit, including Johnson' use of those funds to purchase a new automobile with cash. (Felder Decl. ¶ 60.)

## III.      LEGAL ARGUMENT

In this emergency action, the Commission seeks an immediate asset freeze, a temporary restraining order, and other relief to halt Defendants' ongoing fraud. Such relief turns, in part, on the showing of at least an inference that Defendants have violated the securities laws (in the case of an asset freeze) or a *prima facie* showing of violation (in the case of a temporary restraining order). *See, e.g.*, *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Shields*, No. 11-cv-02121, 2011 WL 3799061, *1 (D. Colo. Aug. 26, 2011). As demonstrated below, the Commission has made such a showing.

**A.      Defendants are Violating the Anti-Fraud Provisions of the Securities Laws.**

The antifraud provisions of the federal securities laws are "to be construed 'not technically and restrictively' but flexibly to effectuate their remedial purposes." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972) (internal quotation omitted). "Fundamentally, both Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act are designed to protect 'investors from fraudulent practice.'" *SEC v. McDuffie*, No. 12-cv-02939, 2014 WL 4548723, *8 (D. Colo. Sept. 15, 2014) (quoting *SEC v. Wolfson*, 539 F.3d 1249, 1257 (10th Cir. 2008); *SEC v. Smart*, 678 F.3d 850, 856 (10th Cir. 2012). The Defendants' conduct – which includes operating a Ponzi scheme, misappropriating investor funds, and making material misrepresentations and omissions to investors – violates these provisions.

**1.      The TAC "Positions" Are Securities.**

As a threshold matter, the "positions" in TAC that Defendants offered and investors purchased are securities under federal law. Congress enacted the securities laws "to regulate *investments*, in whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (emphasis in original). To achieve its purpose, Congress "enacted a broad definition of 'security,' sufficient to 'encompass virtually any instrument that might be sold as an investment.'" *Id.* (quoting *Reeves v. Ernst & Young*, 494 U.S. 56 (1990)).

More specifically, the "positions" are investment contracts pursuant to Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. To be considered an investment contract, there must be (1) the investment of money, (2) in a common enterprise, (3) with an expectation of profits to be derived solely from the efforts of others.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). The Supreme Court has given *Howey* a broad interpretation,

focusing on the "presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975). The investment contract analysis "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. Further, in this Circuit, "[t]he determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit." *Berrios-Bones v. Nexidis, LLC*, 07-cv-193, 2007 WL 3231549, at *5 (D. Utah Oct. 20, 2007) (citing *McGill v. American Land & Exploration Company*, 776 F.2d 923, 925 (10th Cir. 1985)).

The TAC "positions" plainly fit this definition. The victims of the fraudulent scheme invested money in a single entity – TAC – with the expectation of profits through no effort of their own. Indeed, Defendants expressly tell investors that they will not be required to take any action, sell any product, or recruit any investors in order to earn their returns. (Felder Decl. ¶ 17.) Further, according to TAC's bank records, the money invested by each individual is placed with all of the other investors' funds. (Felder Decl. ¶ 34.b.) For these reasons, TAC's positions are securities under federal law. *See also SEC v. Smart*, No. 09-cv-224, 2011 WL 2297659, at *12 (D. Utah June 11, 2011) (noting that *Howey* test has been applied to pyramid schemes).[8]

---

[8] Even in pyramid scheme cases with what appears to be somewhat active investor involvement, courts have generally concluded that, under *Howey's* liberal definition of securities, the test is still satisfied and the pyramid scheme interests are securities. *See, e.g., SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 688-690 (D.D.C. 1991) (discussing *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821 (1973) and *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974)).

2.      **Scheme Liability – Exchange Act Rule 10b-5(a) and (c) and Securities Act Section 17(a)(1) and (3)**

Rule 10b-5(a) and (c) makes it unlawful to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of securities. 17 C.F.R. § 240-10b-5(a) and (c). Securities Act Section 17(a)(1) and (3) prohibits similar conduct in the offer or sale of securities. 15 U.S.C. §§ 77q(a)(1) and (3). "Courts have interpreted these provisions to create what is known as 'scheme liability.'" *McDuffie*, 2014 WL 4548723, at *10; *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008); *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008); *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111-12 (2d Cir. 1998); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471-72 (2d Cir. 1996); *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336-37 (S.D.N.Y. 2004); *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 217, 229 (S.D.N.Y. 2004).

To prove scheme liability, the Commission must prove that Defendants directly or indirectly: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter. *McDuffie*, 2014 WL 4548723, at *10; *see also SEC v. Lucent Tech., Inc.*, 610 F.Supp.2d 342, 360 (D.N.J.2009). To prove liability under Securities Act Section 17(a)(3), however, the Commission need only prove negligence, rather than scienter. *McDuffie*, 2014 WL 4548723, at *10; *see also Smart*, 678 F.3d at 857.

Defendants hatched and operated a scheme to defraud investors into buying "positions" in TAC. As a threshold matter, the entirety of Defendants' operation was a Ponzi scheme, which is by definition a fraudulent scheme and course of business. *See, e.g.*, *Black's Law Dictionary*

15

1348 (10th ed. 2014) (defining a Ponzi scheme as "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments."); *In re Bullion Reserve of North America*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988) ("A 'Ponzi' scheme is any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors."); *SEC v. Mgmt. Solutions, Inc.*, No. 11-cv-1165, 2013 WL 4501088, *7 (D. Utah Aug. 22, 2013) ("The general pattern courts look for when labeling a scheme as 'Ponzi' is 'any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud.'" (*quoting In re Bayou Group, LLC*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007)); *cf. Fidelity Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172, 1178 (10th Cir. 1989) ("[T]here is no evidence of a 'Ponzi scheme' or other inherently fraudulent operation.").

In addition, Johnson and Barnes, acting for themselves and also on behalf of WWTB, committed deceptive acts in furtherance of the scheme to defraud TAC investors. For example, Johnson and Barnes authorized, or attempted to authorize, Ponzi payments to investors. (Felder Decl. ¶¶ 36.c & 45.) *See Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1127-28 (C.D. Cal. 2008) (Ponzi payment is a deceptive act for purposes of Rule 10b-5(a) and (c)). Further, Johnson misappropriated significant investor funds for her own personal use, and she also misappropriated investor funds for Barnes' personal use. (Felder Decl. ¶¶36.c & 36.d.) Defendants also made numerous false and misleading statements and omissions in furtherance of the scheme, detailed below. *See, e.g., SEC v. Sullivan*, --- F. Supp. 3d ---, 2014 WL 4670929, *8 (D. Colo. Sept. 19, 2014) (misstatements can be part of scheme liability, so long as there is

deceptive conduct in addition to misrepresentations); *In the Matter of Flannery and Hopkins*, SEC Rel. No. 34-73840, 2014 WL 7145625, *12-19 (Dec. 15, 2014) (scheme liability can be based on fraudulent misstatements).

Defendants also acted with scienter. Scienter can be met by a showing of knowledge or recklessness. *Smart*, 678 F.3d at 856-57. The Tenth Circuit has defined recklessness under the securities laws as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that it is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Level 3 Communications, Inc. Sec. Lit.*, 667 F.3d 1331, 1343, n.12 (10th Cir. 2012) (quoting *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001)). As an initial matter, the very act of operating a Ponzi scheme demonstrates fraudulent intent. *See, e.g.*, *SEC v. Parrish*, 2012 WL 4378114, at *3 (D. Colo. Sept. 25, 2012) (quoting *Webster v. Omnitron Int'l*, 79 F.3d 776, 785 (9th Cir.1996)) ("[a] jury could rationally conclude that the promotion of a pyramid scheme demonstrates the necessary fraudulent intent")); *cf. SEC v. Mgmt Solutions, Inc.*, No.11-cv-1165, 2013 WL 4501088, *6 (D. Utah Aug. 22, 2013) (noting, in the context of the Uniform Fraudulent Transfers Act, that "'[t]he mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud.'") (quoting *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008)).

Here, the facts show Johnson and Barnes – and as a result WWTB[9] – were fully aware that TAC was a Ponzi scheme. Johnson and Barnes founded TAC, and at all times controlled TAC's operations. (Felder Decl. ¶¶15, 33, 43-45.) Thus, they were aware that TAC was a Ponzi scheme. Further, Johnson had access to or control over accounts that held investor funds, and

---

[9] The scienter of Johnson and Barnes, who founded and control WWTB, is imputed to the corporate entity. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-1107 (10th Cir. 2003).

Barnes had control over distribution of investor funds. (Felder Decl. ¶¶ 33 & 45.) Accordingly, they were aware that there were no sources of revenue other than funds from new investors and, therefore, that TAC was making Ponzi payments to investors. Finally, Defendants knowingly misappropriated investor funds, which is additional, significant evidence of scienter. *See, e.g.*, *Centra, Inc. v. Chandler Ins. Co., Ltd.*, 2000 WL 1277672, *14 (10th Cir. 2000) ("[T]he fact that Defendants misappropriated and personally benefitted from Plaintiffs' investment … sufficiently established that they had the requisite intent to deceive, manipulate, or defraud ….") (internal citation and quotations omitted).

### 3.      Misleading Statements and Omissions – Exchange Act Section 10(b) and Rule 10b-5(b)

In addition to operating a fraudulent Ponzi scheme, Defendants also made numerous misstatements and omissions. As detailed above, Defendants (1) misrepresented TAC's investment returns, claiming the scheme was a stable, lifetime income plan that generates returns through a complicated "triple algorithm" when, in fact, TAC was a pure Ponzi and pyramid scheme; and (2) made material omissions by touting the friendly, community nature of TAC while not disclosing that Johnson and Barnes were misappropriating investor funds for their personal use.

To prove a misstatement or omission under Exchange Act Section 10(b) and Rule 10b-5(b), the Commission must demonstrate that Johnson, Barnes, and WWTB, directly or indirectly: (1) each made an untrue statement of material fact or omitted to state a material fact; (2) with scienter; (3) in connection with the purchase or sale of a security; and (4) using any means of interstate commerce or of the mails.  17 C.F.R. § 240.10b-5(b); *Smart*, 678 F.3d at 856-57; *Wolfson*, 539 F.3d at 1256.

18

Under Rule 10b-5(b), "the maker of the statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296, 2302 (2011). An individual defendant is liable for his or her own oral misstatements and omissions. *See McDuffie*, 2014 WL 4548723, *8. Moreover, as "*Janus* does not alter the well-established rule that 'a corporation can act only through its employees and agents,'" *In re Merck & Co., Inc. Securities, Derivative, & ERISA Litig.*, No.05-1151, 2011 WL 3444199, *25 (D.N.J. Aug. 8, 2011) (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)), corporate entities are properly held responsible for the statements of their agents, particularly where, as here, the entity is closely held and controlled by a small number of individuals. In this case, Johnson, Barnes, and WWTB were the "makers" of numerous fraudulent statements. As explained above, the statements were made personally by Johnson and Barnes in videos and other promotional material posted on TAC's website and other online channels. And WWTB, which does business as TAC and operates the website on which various misstatements were published, is liable for those statements, which were made by its agents, Johnson and Barnes.

Defendants not only made direct misrepresentations, they omitted to state critical facts – most notably, the fact that TAC was a Ponzi scheme. When an individual or entity undertakes to make statements, they must speak "fully and truthfully." *See, e.g.*, *SEC v. Curshen*, 372 Fed. Appx. 872, 880 (10th Cir. 2010) ("[W]here a party without a duty elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information with respect to the subjects on which he undertakes to speak."). As detailed above, it is clear that, despite making frequent statements about the health and viability of the TAC scheme,

Defendants did not speak the full truth when they failed to inform investors that TAC was an unsustainable Ponzi scheme.

Defendants' misrepresentations and omissions were material. Information is considered material when there is a substantial likelihood that a reasonable investor would consider it important in determining whether to buy or sell securities. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976); *U.S. v. Nacchio*, 519 F.3d 1149, 1158 (10th Cir. 2008). For omissions, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 439. Misrepresentations about the financial condition of a company and use of funds are material. *See Kunz v. SEC*, 64 Fed. App'x 659, 665 (10th Cir. 2003) ("[S]urely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.") (quoting *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980)); *SEC v. Bravata*, 763 F. Supp. 2d 891, 916 (E.D. Mich. 2011) ("There can be little doubt that if the complete story were told, any reasonable investor would have had a different picture of the company, which likely would have altered his or her investment decision."); *SEC v. TLC Inv. and Trade Co.*, 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001) ("There is no dispute that reasonable investors would have considered it important in making an investment decision that . . . their money was being used in various improper schemes, including racehorses and paying returns of other investors. . . ."); *SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 177 (D.D.C. 1998) (finding defendants' operating a pyramid scheme material). Here, there can be no doubt that Defendants'

misrepresentations and omissions – relating to TAC's operation as a Ponzi scheme, and the misappropriation of investor funds – were material.

Defendants also acted with scienter. As explained above, given their intimate involvement in TAC, Defendants knew (or were reckless in not knowing) that TAC was operating as a Ponzi scheme. Moreover, Defendants knew that they were misappropriating investor funds for their own personal benefit.

Defendants' conduct was also "in connection with" the purchase or sale of securities. "The 'in connection with' requirement is broadly interpreted to cover any fraud that 'coincide[s] with a securities transaction.'" *Smart*, 678 F.3d at 857 (quoting *Wolfson*, 539 F.3d at 1262). Indeed, "'misrepresentations made to induce a party to purchase a security *or to influence an investment decision* are made "in connection with the purchase or sale of a security."'" *Smart*, 678 F.3d at 857 (quoting *Wolfson*, 539 F.3d at 1262) (emphasis in *Smart*). Here, the misstatements and omissions were made to induce investors to purchase TAC "positions," which are securities under federal law.

Finally, Defendants used the means of interstate commerce in perpetrating their scheme. For example, TAC solicits investors through its website and other internet videos. (Felder Decl. ¶ 53.) Further, investors are directed to purchase "positions" with credit cards through a web-based payment platform. (Felder Decl. ¶ 18.)

**4.     Misleading Statements and Omissions – Securities Act Section 17(a)(2)**

The same misstatements and omissions described above also constitute violations of Section 17(a)(2) of the Securities Act. Under Section 17(a)(2), the SEC must prove that the Defendants directly or indirectly: (1) obtained money or property by means of an untrue

statement of material fact or an omission to state a material fact; (2) with negligence; (3) in the

offer or sale of securities; and (4) using any means of interstate commerce or of the mails. 15

U.S.C. § 77q(a)(2); *Smart*, 678 F.3d at 856-57. The Tenth Circuit has explained that Section

17(a) "requires substantially similar proof" as for a violation of Section 10(b) of the Exchange

Act. *Wolfson*, 539 F.3d at 1256. There are two principal differences between Section 17(a)(2)

and Section 10(b). The first, as the vast majority of courts to have considered the issue have held,

is that a defendant need not be a "maker" of a statement to be liable. 15 U.S.C. § 77q(a)(2)

(providing liability where defendant "obtain[s] money or property by means of" misstatement or

omission); *see also, e.g.*, *SEC v. Benger*, 931 F. Supp. 2d 904, 906-07 (N.D. Ill. 2013) (holding

*Janus* does not apply to Section 17(a) claims); *SEC v. Stoker*, 865 F. Supp. 2d 457, 465

(S.D.N.Y. 2012) (same); *SEC v. Sentinel Mgmt. Group, Inc.*, No. 07 C 4684, 2012 WL 1079961,

at *14-15 (N.D. Ill. Mar. 30, 2012) (same); *SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp.

2d 377, 421 (S.D.N.Y. 2012) (same); *but see SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011)

(applying *Janus* to Section 17(a) claims). The second is that to establish a violation of Section

17(a)(2), the Plaintiff need not establish scienter, only that the defendants acted negligently.

*Wolfson*, 539 F.3d at 1256. Thus, for the same reasons explained above, Defendants have also

violated Section 17(a)(2).

**B.     An Immediate Asset Freeze is Necessary to Prevent Further Dissipation of Investor Funds.**

       To prevent further dissipation of investor funds, the Commission requests the Court

immediately freeze all assets of the Defendants and Relief Defendant that derive, directly or

indirectly, from investors funds connected to the TAC scheme. The Court has broad equitable

powers to prevent violators of the securities laws from enjoying the fruits of their misconduct,

including freezing assets. *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965); *see also SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103-1104 (2d Cir. 1972). In particular, courts may order an asset freeze to ensure that defendants do not dissipate assets pending final judgment and to ensure that victims of the securities fraud are compensated. *Manor Nursing Centers*, 458 F.2d at 1105-06; *see also SEC v. Presto Telecommunications, Inc.*, 153 Fed. App'x 428, 430 (9th Cir. Nov. 2, 2005); *SEC v. The Infinity Group Co.*, 212 F.3d 180, 197 (3d Cir. 2000).

To obtain an asset freeze, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) (internal quotations and citation omitted). This is a lesser showing than is required to obtain a preliminary injunction against future violations of the securities laws. *Id.* Such a burden is appropriate because "the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990). Moreover, "[a] freeze is particularly warranted where the defendant's alleged conduct involves fraud." *SEC v. Credit Bancorp Ltd.*, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) ("Because of the fraudulent nature of the appellants' violations, the court could not be assured that appellants would not waste their assets prior to refunding public investors' money.")). As to Relief Defendant Achieve International, to obtain an asset freeze the Commission need only show that it received ill-gotten gains without a legitimate claim to the funds. *See, e.g.*, *SEC v. Heden*, 51 F. Supp. 2d 296, 299 (S.D.N.Y. 1999); *SEC v. Aragon*

*Capital Advisors, LLC*, No. 07 Civ. 919(FM), 2011 WL 3278642, at *9 (S.D.N.Y. July 26, 2011). The Commission has made these showings here.

As detailed above, the Commission has shown a strong likelihood of succeeding on the merits of its claims that Defendants' operation of the TAC Ponzi scheme violated the securities laws, and that Achieve International received proceeds of the fraudulent scheme to which it had no legitimate claim.

An asset freeze is particularly important given that there is a significant prospect of additional dissipation of investor assets. In just the last month, Defendants have misappropriated significant investor funds and attempted to make additional fraudulent Ponzi payments. Specifically, TAC has raised more than $3.8 million in investor funds, but has already dissipated approximately $1.4 million in Ponzi payments to investors or through fees charged by payment processors. (Felder Decl. ¶ 36.b.) Indeed, TAC has attempted to make additional Ponzi payments as recently as the last few weeks. (Felder Decl. ¶¶ 43-44.) As a result, more than $800,000 in investor funds are currently being held by TAC's payment processor, and are slated for Ponzi payment distribution, although the Commission understands the processor has not yet completed any of the payments. (Felder Decl. ¶ 44.)

In addition, Defendants have misappropriated significant investor funds, including Johnson's misappropriation of more than $100,000 in just the last 35 days from an account controlled by Relief Defendant Achieve International. (Felder Decl. ¶ 52.) Moreover, there are recent, suspicious circumstances surrounding Johnson's handling of investor funds. After Johnson was contacted by a Colorado Division of Securities investigator in mid-January, 2015, Johnson closed TAC's accounts at FirstBank and transferred the money to another bank. (Felder

Decl. ¶ 38.) There does not appear to be a legitimate business reason for this transfer. (Felder

Decl. ¶ 38.) Absent an order freezing Defendants and Relief Defendants' accounts and assets,

there is no reason to think this misappropriation and dissipation would not continue.

The Commission requests that, in order to maintain the *status quo* and prevent further

harm to investors, the Court freeze all investor funds, wherever located, as well as all assets

traceable to such investor funds, directly or indirectly, that are under the control of Defendants or

Relief Defendant. Thus far, the Commission has identified at least nine accounts at banks,

payment processors, and other entities that have been used in the TAC scheme and that should be

subject to the freeze. (Felder Decl. ¶ 63.) The Commission continues to attempt to locate

additional accounts related to the scheme, which should also be subject to the freeze.

**C.     A Temporary Restraining Order is Appropriate to Prevent Ongoing Violations.**

In addition to an asset freeze, the Commission also requests the Court issue a temporary

restraining order enjoining Defendants from any further violations of the anti-fraud provisions of

the securities laws. Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act

empower the SEC, "upon a proper showing," to seek the Court's issuance of a "temporary

injunction or restraining order." 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1). To make a proper

showing warranting such relief, the SEC must demonstrate: (1) a *prima facie* case that a violation

of the securities laws has occurred; and (2) a likelihood that a violation will occur again in the

future. *See SEC v. Cavanagh*, 155 F.3d 129, 132, 135 (2d Cir. 1998); *SEC v. Unifund SAL*, 910

F.2d 1028, 1037 (2d Cir. 1990); *SEC v. Shields*, No. 11-cv-02121, 2011 WL 3799061, *1 (D.

Colo. Aug. 26, 2011).

Because the SEC appears "not as an ordinary litigant, but as a statutory guardian charged

with safeguarding the public interest in enforcing the securities laws," the Commission faces a lower burden than a private litigant when seeking a temporary restraining order or a preliminary injunction. *SEC v. Mgmt. Dynamics, Inc.*, 515 F. 2d 801, 808 (2d Cir. 1975).[10] Unlike private litigants, the SEC is not required to show irreparable injury or a balance of equities in its favor in order to support the entry of a temporary restraining order or preliminary injunction under the Exchange Act. *See, e.g., Unifund SAL*, 910 F.2d at 1036-37. Courts have emphasized that, in considering the request for emergency injunctive relief, district courts must give special emphasis to the "need to enforce the securities laws." *Management Dynamics, Inc.*, 515 F.2d at 809 n.5.

As detailed above, the Commission has made a *prima facie* showing that the Defendants are violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

In addition, Defendants' actions create a likelihood that a violation will occur again in the future. As a threshold matter, evidence of past illegal conduct is highly suggestive of a likelihood of future violations. *See Manor Nursing Centers, Inc.*, 458 F.2d at 1100. Moreover, in assessing the likelihood of repetition, courts consider the character of the violation, the degree of scienter involved, and the degree to which a defendant's occupation or activities may present future opportunities to violate the law. *See Cavanagh*, 155 F.3d at 135; *SEC v. Commonwealth Chem.*

---

[10] A private litigant seeking a preliminary injunction in this District must show: (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) that the movant will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980); *In re Qwest Communications International, Inc. Securities Litigation*, 241 F.Supp.2d 1119, 1122 (D.Colo.2002).

*Sec., Inc.*, 574 F.2d 90, 100-01 (2d Cir. 1978). As explained above, Defendants' conduct in operating an illegal Ponzi scheme and misappropriating investor funds is egregious, recurrent, and highly likely to recur. Indeed, the Ponzi scheme has been Defendants' business model for nearly a year and is currently ongoing. The ongoing need to protect investors from Defendants' fraudulent conduct is urgent.

**D.     A Prohibition Against Soliciting Additional Investment Funds is Necessary to Prevent Investors from Being Further Harmed.**

Defendants and Relief Defendant should also be prohibited from accepting or disbursing any additional funds from investors or potential investors, at least until the Court can review additional information obtained through expedited discovery and the accountings, discussed below. Absent such an injunction, earlier investors will continue to be paid "returns" from newer investor funds, thereby depriving those newer investors of not only their promised returns, but of their principal investment. In addition, existing and new investors may be lured into making additional contributions to Defendants' Ponzi scheme and be injured.

**E.     An Accounting is Necessary to Identify the Location of Investor Funds.**

The Commission further requests that all Defendants and the Relief Defendant be ordered to prepare an accounting of, among other things, the proceeds of their scheme, the identities of the investors, the amounts invested, and the disposition and current location of all investor funds. Courts have the power to order accountings in SEC actions. *SEC v. International Swiss Investment Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990). An accounting is a necessary and appropriate aid to detect and prevent further violations, as well as identify the location of investor funds.

**F.**     **Expedited Discovery, Alternative Means of Service, and a Prohibition against the Destruction or Alteration of Documents is Necessary to Prepare for Review of Plaintiff's Motion for a Preliminary Injunction.**

The Commission also requests that the Court set this matter for a hearing on its motion for a preliminary injunction prior to the expiration of the temporary restraining order.  To allow it to prepare for that hearing, the Commission requests that the Court order expedited discovery and permit alternative means of service.  In addition, the Commission requests that the Court include in its order a general prohibition against the destruction or alteration of documents.  This should impose no hardship on the Defendants and Relief Defendant and will help ensure that a full record of this matter can be developed through discovery and at any subsequent hearing or trial.

**G.**     **Entry Of An Order *Ex Parte* Is Appropriate.**

Under Federal Rule of Civil Procedure 65(b), an *ex parte* temporary restraining order may be entered if (1) it appears from specific facts shown by affidavit that immediate and irreparable injury, loss or damage will result before the adverse party can be heard in opposition; and (2) the applicant's attorney certifies the reasons supporting the claim that notice should not be required.  As explained in the Certification of Nicholas P. Heinke, which is attached, the Commission is concerned that if the Defendants become aware of this action before the asset freezes are instituted, they will move or dissipate their assets.  Accordingly, *ex parte* relief is necessary to prevent the Defendants from dissipating funds from the accounts of which the Commission is aware.

## IV.   CONCLUSION

For the reasons stated above, the Commission respectfully requests that its motion for

emergency relief be granted and that the Court issue an Order in the form attached to this motion.

DATED: February 12, 2015.

Respectfully submitted,

_____
Nicholas P. Heinke
Gregory A. Kasper
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1071 (Heinke)
(303) 844-1026 (Kasper)
HeinkeN@sec.gov
KasperG@sec.gov

29